**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**ALPHA SACKO** | **Case No. 2:25-cr-00231-JDW** |

## MEMORANDUM

Law enforcement officers need a warrant to search or arrest someone, but that requirement relaxes when they have probable cause to think the person is in the process of committing a crime. On April 28, 2025, DEA agents had reason to think Alpha Sacko was on his way to a drug transaction with a confidential source, so they had probable cause to arrest him. And when they arrested him, they could search him. From there, the officers received Mr. Sacko's consent to search his car and his cell phones, and he agreed to speak with them. Mr. Sacko seeks to suppress all that evidence, but there's no basis to suppress any of it. He also seeks to suppress evidence that officers recovered from his home pursuant to a search warrant, but there's no reason to do that, either, because the warrant was valid. Finally, Mr. Sacko asks me to order the Government to disclose to him the identity of a confidential source who provided information to the Government. I will order the Government to provide the information to Mr. Sacko's lawyer, but I will restrict its dissemination to Mr. Sacko himself.

## I.     BACKGROUND

### A.     Factual History

In February 2025, the Drug Enforcement Administration Philadelphia Enforcement Group 42 initiated an investigation into Alpha Sacko for suspected narcotics trafficking. Mr. Sacko has two prior federal drug trafficking convictions. Agents met with a cooperating source, CS-1, who identified Mr. Sacko, also known as "Afraca,"[1] as a distributor of methamphetamine and provided agents with a telephone number ending in 4518, which CS-1 stated Mr. Sacko used in connection with drug trafficking activities. CS-1 agreed to cooperate with the government to assist her significant other, who was in custody.[2]

Prior to March 2025, CS-1 communicated with Mr. Sacko on multiple occasions. Between February and March 2025, CS-1 and DEA agents discussed a plan to have CS-1 talk to Mr. Sacko and have Mr. Sacko contact a second cooperating source, CS-2, whose telephone number agents gave to CS-1. Those efforts did not initially result in any transactions or in Mr. Sacko contacting CS-2. Because the investigation stalled, agents met with CS-1 and CS-2 to develop a new plan to prompt Mr. Sacko to initiate contact

---

[1] The text message correspondence between Mr. Sacko and CS-2 indicates that Mr. Sacko's name is saved as "Africa," not "Afraca." (*See* Gov. Ex. 10, played at Tr. Suppress. Hr'g at 27:25.)

[2] I heard testimony regarding these events at a suppression hearing on January 12, 2026, including testimony from DEA Special Agent Ryan Scanlan about the investigation, arrest, searches, and Mr. Sacko's post-arrest statements. I find Agent Scanlan's testimony credible.

with CS-2. As part of that plan, agents coordinated communications between CS-1 and CS-2, drafted a text message for CS-1 to send to Mr. Sacko, and directed CS-1 to introduce CS-2 as a potential narcotics customer, even though CS-1 and CS-2 did not know each other before the investigation. After CS-1 sent the message, Mr. Sacko called CS-2. CS-2 tried to reach Mr. Sacko again, but the call went unanswered. CS-2 then contacted CS-1, who again reached out to Mr. Sacko to facilitate further communication. Mr. Sacko resumed contact with CS-2 on March 10, 2025, and agents began monitoring their communications about the sale of controlled substances.

Between March 12, 2025, and April 22, 2025, Mr. Sacko engaged in a series of controlled narcotics transactions with CS-2. Each controlled transaction followed standard DEA procedures. Before each meeting, agents searched CS-2 and found no contraband, weapons, currency, or drugs; they supplied prerecorded buy money; and they equipped CS-2 with audio and video recording equipment. Agents debriefed CS-2 after each transaction. They also conducted physical surveillance before, during, and after each transaction and, in some instances, employed aerial surveillance. For each transaction, agents did not personally observe a hand-to-hand exchange between Mr. Sacko and CS-2. Instead, they relied on recordings, aerial footage, and debriefings of CS-2 to determine what occurred.

The first controlled purchase occurred on March 12, 2025. Mr. Sacko agreed to sell CS-2 approximately one pound of methamphetamine for $1,800 and directed CS-2 to meet him at a Home Depot in Philadelphia. CS-2 entered Mr. Sacko's Audi Q8, and the

two drove to another location. Mr. Sacko retrieved a bag containing a white crystalline substance and provided it to CS-2. CS-2 provided the prerecorded funds and returned to agents shortly thereafter. The agents seized the narcotics, which field-tested positive for methamphetamine. CS-2 identified Mr. Sacko from a driver's license photograph.

Following that transaction, agents sought and obtained warrants to expand their investigation. On March 14, 2025, Magistrate Judge Scott Reid issued a warrant authorizing prospective location data for the 4518 phone and a GPS tracking warrant for Mr. Sacko's Audi. The ping warrant was valid until April 11, 2025, while the GPS vehicle tracking warrant expired on April 28, 2025. Agents renewed the order authorizing the collection of prospective location information for the 4518 phone on April 9, 2025. On March 17, 2025, Magistrate Judge Pamela Carlos issued an order authorizing a pen register and trap and trace device for a WhatsApp account associated with the same phone number.

On March 25, 2025, Mr. Sacko sold CS-2 approximately 100 fentanyl pills for $500. That morning, agents observed the Audi parked in the rear driveway of 4220 Levick Street. Agents watched Mr. Sacko leave that location, drive the Audi directly to the meeting location, and complete the transaction. CS-2 entered the vehicle, received the pills, and returned to the agents. The agents seized the pills, which tested positive for fentanyl.

On March 27, 2025, Mr. Sacko sold CS-2 another pound of methamphetamine for $1,800. Before the transaction, agents observed Mr. Sacko leave 4220 Levick Street, stop briefly at another address, and then proceed to the meeting location. After the

transaction, CS-2 reported seeing what appeared to be a firearm in Mr. Sacko's waistband. Mr. Sacko is a convicted felon and prohibited from possessing a firearm. CS-2 surrendered the methamphetamine to the agents after the transaction.

On April 8, 2025, Mr. Sacko sold CS-2 approximately 100 fentanyl pills for $500. That morning, investigators observed the Audi pull into the rear driveway of 4220 Levick Street. Agents later observed Mr. Sacko leave the residence and drive directly to the meeting location, where the transaction occurred inside the vehicle. CS-2 returned the pills to the agents, who seized and tested them.

On April 10, 2025, Mr. Sacko sold CS-2 approximately one pound of methamphetamine for $1,800. Agents observed Mr. Sacko leave 4220 Levick Street carrying a small white object, drive to the meeting location, and complete the transaction. CS-2 surrendered the methamphetamine to the agents afterward.

Based on the cumulative investigation and the controlled purchases that had occurred, the agents applied for search warrants. On April 18, 2025, United States Magistrate Judge Lynne Sitarski issued an order authorizing the search of 4220 Levick Street and Mr. Sacko's 2021 Audi Q8. A detailed affidavit accompanied the application, which describes the investigation that began in February 2025 and identifying Mr. Sacko as an active, large-scale trafficker of methamphetamine and fentanyl pills who used 4220 Levick Street to further his drug trafficking activities. The affidavit details surveillance observations tying the 4220 Levick Street residence and the Audi to the controlled purchases, including repeated observations of Mr. Sacko departing from the residence in

5

the Audi and driving directly to controlled transactions. Mr. Sacko's driver's license listed his address as 4220 Levick Street.

The final controlled purchase occurred on April 22, 2025, when Mr. Sacko agreed to sell CS-2 one pound of methamphetamine and 100 fentanyl pills for $2,300. Agents surveilled Mr. Sacko's residence that morning and observed him moving between the residence and his vehicle before driving to the meeting. CS-2 entered the vehicle, provided the funds, and exited with a bag that contained fentanyl pills and methamphetamine. The methamphetamine was roughly 113 grams short. After the transaction, CS-2 contacted Mr. Sacko, who acknowledged the shortage and stated, "I O U." (Gov. Ex. 14.[3]) CS-2 responded, "[t]hat's okay next time I see u I know you'll make it right." (*Id.*)

After that transaction, Mr. Sacko and CS-2 continued communicating about completing another sale. On April 26, 2025, during a recorded call, Mr. Sacko agreed to sell CS-2 two additional pounds of methamphetamine and 100 fentanyl pills on April 28 and to provide the methamphetamine he still owed from the April 22 transaction. At 10:01 a.m. on April 28, 2025, CS-2 texted the defendant that CS-2 would be arriving in Philadelphia around 11:30 a.m., and Mr. Sacko responded "kk." (Gov. Ex. 16.) That same morning, at approximately 10:03 a.m., agents conducting surveillance observed Mr. Sacko

---

[3] Citations to "Gov. Ex." refer to exhibits that the Government introduced at the suppression hearing.

leave 4220 Levick Street and enter a Chevrolet Traverse rather than the Audi that Mr. Sacko in prior transactions.

Based on the cumulative investigation and the series of prior controlled purchases, agents stopped the Chevrolet Traverse with the intent to arrest Mr. Sacko. Marked Pennsylvania State Police vehicles blocked the Chevrolet Traverse from the front and rear. DEA Special Agent Ryan Scanlan exited his vehicle with his firearm drawn and ordered Mr. Sacko not to move. Mr. Sacko complied at first but then reached back toward the vehicle. Officers removed Mr. Sacko from the vehicle, placed him in handcuffs, and recovered a loaded firearm from his waistband and a cell phone from his hand. Officers did not have an arrest warrant and did not announce the arrest before restraining Mr. Sacko.

During the arrest, officers opened the front passenger-side door, the back hatch, and the rear, driver-side door to look into the vehicle. These actions occurred without consent to search the vehicle. After officers placed Mr. Sacko in a law enforcement vehicle, Agent Scanlan requested consent to search the vehicle. Agent Scanlan testified, and camera footage reflects, that his interaction with Mr. Sacko was brief and did not involve repeated or prolonged questioning. Although the videos obscure faces, they show a calm exchange in which Agent Scanlan discussed the consent to search form and allowed Mr. Sacko time to review it. Mr. Sacko then signed a written consent to search form while remaining handcuffed. Agent Scanlan did not remove the handcuffs due to safety concerns and the stress of the arrest. Officers did not advise Mr. Sacko of his *Miranda* rights at the scene.

While speaking with Agent Scanlan at the scene, Mr. Sacko asked for his phones so that he could make some calls and retrieve information, including in part to provide information to Agent Scanlan as part of an effort to cooperate. Agent Scanlan told Mr. Sacko that he would not permit Mr. Sako to make any calls at that time but could retrieve the phone from the vehicle and allow for a call when appropriate, and Mr. Sacko stated that Agent Scanlan could grab the phones. Officers recovered another iPhone, as well as other items, from the vehicle following Mr. Sacko's consent.

After the arrest, Agent Scanlan and another officer transported Mr. Sacko to the DEA Philadelphia Field Division. He was searched, and officers recovered cash that included prerecorded buy money from the controlled purchases. Agent Scanlan then advised Mr. Sacko of his *Miranda* rights, after which Mr. Sacko executed an Advice Of Rights form and agreed to speak with agents. By signing the form, Mr. Sacko affirmed that "[s]omeone has read to me this advice of rights and I understand what my rights are. At this time, I am willing to freely and voluntarily answer questions without a lawyer present." (ECF No. 33-1 at 1.) The interview lasted approximately ninety minutes, and Agent Scanlan requested recording for the interview, but the equipment failed. During the interview, Mr. Sacko described his drug trafficking activities, including his source of supply, the individuals to whom he sold narcotics, and the prices he charged.

During that same interview, Mr. Sacko signed a consent form authorizing searches of the recovered cell phones and provided the passwords for those devices. Agent Scanlan testified that Mr. Sacko requested access to his phone to assist with the investigation,

8

provide information to the DEA, and make personal phone calls. The consent authorized a search of the entire phone, not limited to particular messages or photographs. (*Id.* at 124:17-22.)

That same morning, agents executed the previously issued search warrant at 4220 Levick Street. Agents recovered a white plastic shopping bag, a black digital scale, correspondence from the IRS addressed to Mr. Sacko at 4220 Levick Street, and an address book and heat sealer. Agents recovered no narcotics from the residence.

### B.      Procedural History

On April 29, 2025, a criminal complaint was filed charging Mr. Sacko with narcotics and firearms offenses arising from a DEA investigation. On May 27, 2025, a federal grand jury indicted Mr. Sacko on seven counts: three counts of distributing more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); two counts of distributing fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); one count of distributing more than 50 grams of methamphetamine and fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), (b)(1)(C); and one count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).

Mr. Sacko's trial is scheduled to begin on June 8, 2026. He has moved to suppress physical evidence and statements stemming from the vehicle stop and arrest. He argues that law enforcement lacked reasonable suspicion to stop the Chevrolet Traverse, lacked probable cause to arrest him, obtained involuntary consent to search the vehicle and cell phones, and relied on a search warrant that failed to establish a sufficient nexus between

the alleged drug trafficking and the residence at 4220 Levick Street. He also contends that his post-arrest statements and the evidence seized from the challenged searches, including the firearm, two cell phones, a white plastic shopping bag, a black digital scale, an address book and heat sealer, and IRS correspondence addressed to him, constitute fruit of the poisonous tree and must be suppressed.

In addition to the Motion to suppress, Mr. Sacko filed motions for a bifurcated trial, for disclosure of the identity and information pertaining to confidential informants, and to compel the production of complete unredacted discovery. In his Motion for disclosure, Mr. Sacko argues that disclosure of the two confidential informants' identities and related information is necessary to prepare his defense, challenge the Government's evidence, and assess the credibility and potential bias of the informants who participated in or facilitated the charged transactions. The Government opposes all motions except bifurcation. The Government has also moved to admit evidence under Federal Rule of Evidence 609 and to admit recordings and transcripts. I held a suppression hearing and heard oral argument on January 12, 2026.

## II.    DISCUSSION

### A.    Motion To Suppress Physical Evidence

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving the challenged search or seizure was unreasonable under the Fourth

Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992) (citations omitted). However, once a defendant shows that officers conducted a search or seizure without a warrant, the burden shifts to the government to demonstrate that the search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). The Government must demonstrate by a preponderance of the evidence that the challenged evidence is admissible. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

If the challenged search or seizure is unlawful, the exclusionary rule forbids the use of improperly obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). "The exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure,'" as well as "'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h).  Federal Rule of Criminal Procedure 12 provides that suppression motions must be made prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(C). Mr. Sacko's motion seeks to exclude evidence that officers obtained that flow from his arrest (the gun, data from his cell phones, and his own statements) and evidence obtained from the search of 4220 Levick Street.

### 1.    Evidence obtained from the arrest

Mr. Sacko contends that his arrest was improper and that various procedural improprieties after the arrest also render evidence inadmissible. The threshold question is whether the arrest was proper. It was.

A warrantless arrest[4] is reasonable under the Fourth Amendment when there is probable cause to believe that a crime has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Courts assess probable cause under a "totality-of-the-circumstances" approach. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Probable cause is a practical concept that turns on probabilities in a particular factual context, not on rigid legal formulas. *Id.* at 232.

Officers had probable cause to arrest Mr. Sacko when they stopped his vehicle. They had information about his activities over the past six weeks, including that he had engaged in several controlled drug transactions with CS-2; that he made final logistical arrangements to meet CS-2 the morning of those transactions; that he carried a firearm to at least one of those transactions; and that his pattern was to leave the house at 4220 Levick Street and drive to the transactions. They also had information from that day,

---

[4] At the hearing, the parties agreed that probable cause governs the stop and arrest. I have therefore not examined whether agents had reasonable suspicion to stop Mr. Sacko.

including that Mr. Sacko had made plans to meet CS-2 that morning, that he had agreed with her on a specific quantity (including a quantity to make up for the shortfall in the last transaction), and that he was departing 4220 Levick Street shortly before the transaction.

Mr. Sacko argues that there was no probable cause because he was in a different car than he was for the past controlled buys (the Chevy Traverse instead of the Audi Q8). But that distinction, on its own, doesn't eliminate probable cause. The probable cause standard is a totality-of-the-circumstances test, and the variation in car model doesn't change the overall picture that the officers had at the time. Mr. Sacko also appears to suggest that the arrest was unlawful because officers did not announce that he was under arrest before restraining him. That argument goes nowhere. Officers need not announce an arrest before effectuating it, and probable cause does not depend on the words officers speak at a particular moment. What matters is whether officers had probable cause at the time of the seizure. They did. The warrantless arrest complied with the Fourth Amendment. I will therefore turn to the post-arrest concerns that Mr. Sacko raises.

### a.    The gun

Officers recovered the gun from Mr. Sacko when they searched him incident to his arrest. After a legal arrest, an officer may search "the space within an arrestee's immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (internal quotes omitted). At the time that the officers arrested Mr. Sacko, they searched his person for areas where he might have a weapon or other dangerous device. They found the gun in his waistband.

13

Certainly, that was an area from which he might have retrieved it and threatened officer safety. Therefore, there is no basis to suppress the gun.

### b.    Cellphone data

At each step after the arrest until they accessed the cellphone data, officers acted permissibly. Officers took one cellphone from Mr. Sacko's hand when they searched him after removing him from the car. That was a search incident to arrest, and Mr. Sacko had it in his hand, so officers acted permissibly in taking it from him.

Officers also retrieved a cellphone from the car after they placed Mr. Sacko in a police car. They could search the car under the automobile exception to the warrant requirement. The automobile exception permits officers to search a vehicle without a warrant when there is probable cause to believe the vehicle contains contraband or evidence of a crime. *Gant*, 556 U.S. at 347. The automobile exception does not require a separate showing of exigency, and probable cause does not dissipate simply because officers immobilize the vehicle. *United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014). When the officers arrested Mr. Sacko, they had reason to believe that he was on his way to engage in a drug transaction with CS-2. Mr. Sacko's possession of a gun in his waistband reinforced that belief and strengthened the probable cause to think that he had drugs in the Traverse. The automobile exception therefore permitted them to search the car. The fact that they found the second cellphone, rather than drugs, is of no moment because the Fourth Amendment permitted them to conduct their search.

In addition, officers could search the Traverse because Mr. Sacko consented to its search. A voluntary consent to search is a well-established exception to the Fourth Amendment's warrant requirement. *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Whether consent was voluntary turns on the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227. Courts consider both the characteristics of the accused and the details of the encounter, but no single factor is dispositive. *Id.* at 226.

Mr. Sacko consented twice to the search of his vehicle that resulted in the collection of the second cellphone. First, Mr. Sacko told Agent Scanlan that he needed his phones to make some calls so that he might offer some useful information to Agent Scanlan. Second, Mr. Sacko signed a consent form authorizing officers to search the Traverse. Both of those consents were voluntary. The camera footage shows that the interactions between Mr. Sacko and Agent Scanlan were brief and did not involve repeated or prolonged questioning. The footage also reflects the two speaking calmly, and Agent Scanlan giving Mr. Sacko time to review and sign the consent form. Nothing in the video or testimony suggests threats, intimidation, or coercion. Nor does the record suggest that the length, repetition, or intensity of the interaction—or the arrest itself— overbore Mr. Sacko's will. Mr. Sacko's personal characteristics further support a finding of voluntariness. He is a 42-year-old adult who reads and understands English, completed two years of college, and operates a family business. He is familiar with the

15

criminal justice system, having prior federal drug convictions and experience with law enforcement.

It is true, of course, the Mr. Sacko was handcuffed and in the back seat of a police car when he interacted with Agent Scanlan. But "'the fact of custody alone has never been enough in itself to demonstrate a coerced … consent to search.'" *United States v. Hovan*, 2021 WL 3771811, at *6 (E.D. Pa. Aug. 24, 2021) (second alteration in original) (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)). Courts in this Circuit have repeatedly found consent voluntary even where a defendant was detained, handcuffed, and surrounded by law enforcement. *See, e.g.*, *United States v. Reyes-Valdez,* No. CR 21-91-2, 2023 WL 5751109 (E.D. Pa. Sept. 6, 2023).

Mr. Sacko argues that the agents should have advised him of his *Miranda* rights before requesting consent. But he points to no authority requiring that, and I am aware of none. *Miranda* warnings are not a prerequisite to a valid consent to search. *See Schneckloth*, 412 U.S. at 227. Said differently, "the absence of Miranda warnings is not dispositive of whether a person voluntarily consented to a search" "because Miranda protections are addressed to constitutional rights that are distinct from Fourth Amendment rights." *Hubbard v. Jeffes*, 653 F.2d 99, 103-04 (3d Cir. 1981).

Finally, after arriving at the DEA's office, Mr. Sacko voluntarily consented to the search of the phones. He signed a separate written consent form authorizing agents to search the two iPhones recovered from the Traverse and provided the passwords for those devices. Nothing about the circumstances surrounding the consent to search the

phones during his interview with the agents at the DEA office suggests coercion, intimidation, or confusion. Mr. Sacko's own actions confirm the lawfulness of the search. After waiving his *Miranda* rights, he asked for his phones to provide information and make calls and did not object to their later search. This interaction shows he understood and consented, so the cell phone search complied with the Fourth Amendment.

### c.    Mr. Sacko's statements

The Fifth Amendment to the Constitution provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, the Supreme Court in *Miranda v. Arizona* held that police may not conduct a custodial interrogation without first administering the now-familiar *Miranda* warnings, which include the right to remain silent and the right to the presence of an attorney. *See* 384 U.S. 436, 479 (1966). In general, if police do not give those warnings, then the prosecution cannot use any statements obtained during the interrogation to establish its case in chief. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990). *Miranda* applies to both inculpatory and exculpatory statements. *Miranda*, 384 U.S. at 444.

A defendant may waive his *Miranda* rights so long as that he makes the waiver "voluntarily, knowingly and intelligently." *Id.* Courts assess the validity of a waiver is valid under the totality of the circumstances. *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983). A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Colorado v. Spring*, 479 U.S. 564, 573 (1987). Courts also consider the defendant's background and experience, including prior interactions

with the criminal justice system. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). A waiver may be written or oral. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Agent Scanlan advised Mr. Sacko of his *Miranda* rights before questioning, and Mr. Sacko signed an Advice of Rights form before agreeing to speak. A signed waiver is strong evidence that a defendant knowingly and voluntarily relinquished his rights. *See Butler*, 441 U.S. at 373. Nothing in the record undermines the validity of Mr. Sacko's waiver. Considering the totality of the circumstances, Mr. Sacko made a free and deliberate decision to speak, and the Fifth Amendment does not require suppression of his statements.

### 2.    Evidence obtained from the search warrant

To issue a search warrant, a neutral magistrate must find, under the totality of the circumstances, a fair probability that contraband or evidence of a crime will be found in a particular place. *Gates*, 462 U.S. at 238. The magistrate judge issuing the search warrant is "entitled to draw reasonable inferences about where evidence is likely to be kept" and may rely on the "conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (citations omitted). Courts reviewing such determinations do not make a *de novo* probable cause assessment. They "simply ... ensure that the magistrate had a substantial basis for ... concluding that probable cause existed." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *Gates*, 462 U.S. at 238-39).

When officers sought the search warrant for 4220 Levick Street in this case, they had reason to think it was Mr. Sacko's home because they had determined that it was the address on this driver's license and they had seen him at the location. Courts uphold warrants to search a suspected drug dealer's home where the affidavit supports three related premises: "(1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or is the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities." *Burton*, 288 F.3d at 104. Put another way, "a magistrate may infer probable cause to search a drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *United States v. Stearn*, 597 F.3d 540, 560 (3d Cir. 2010).

Magistrate Judge Sitarski had that basis here. *First*, the affidavit established that Mr. Sacko had engaged in several sales of wholesale quantities of methamphetamine and fentanyl with CS-2. *Second*, the affidavit established Mr. Sacko's connection to 4220 Levick Street. On several occasions, agents observed him leave that address immediately before traveling to controlled drug transactions. Those facts, coupled with the address being the one on Mr. Sacko's driver's license, supported the inference that Mr. Sacko resided at, or at least exercised control over, the location to be searched.

*Third*, the affidavit established a sufficient nexus between the location and Mr. Sacko's drug trafficking activities. On multiple occasions, Mr. Sacko used 4220 Levick Street as the starting point for drug transactions, departing from the residence and driving

to meet the buyer. That pattern supports the commonsense inference that he used the location as a base of operations and stored evidence of drug trafficking there.

To be clear, probable cause does not require proof that a location is a defendant's formal residence. Nor does it require direct evidence that contraband was inside the home or that officers observed drugs crossing the threshold. *Gates*, 462 U.S. at 243–44. The question is whether there was a fair probability that officers would find evidence of a crime at the location. The affidavit's detailed factual recitation provided ample basis to conclude that Mr. Sacko lived at or exercised control over 4220 Levick Street and that evidence of his drug trafficking would be found there. Judge Sitarski could draw reasonable inferences from Mr. Sacko's repeated use of the location in connection with drug trafficking and from the nature of the offenses under investigation. Thus, the search of the residence was fully consistent with the Fourth Amendment.

But even if the affidavit fell short of probable cause—which it did not—the good faith exception would apply. Suppression is appropriate only in narrow circumstances, such as when an affidavit is so lacking in indicia of probable cause that no reasonable officer could rely on it. *United States v. Leon*, 468 U.S. 897, 923 (1984). This is not the case here. Agents sought judicial approval, presented a detailed affidavit, and relied on a warrant that a neutral magistrate judge issued. "The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge,* 246 F.3d 301, 307–08 (3d Cir. 2001)

20

(citations omitted). Nothing about the affidavit was bare bones, misleading, or facially deficient. Reasonable officers could, and did, rely on it in good faith.

### B.      Identity Of CS-1

Mr. Sacko seeks the identity of CS-1, but the Government resists on grounds of privilege and safety.[5] The Government holds a qualified privilege to withhold the identity of a confidential informant who provides information about criminal activity. *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (citing *Roviaro v. United States*, 353 U.S. 53 (1957)). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement[,]" and "[t]he privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro*, 353 U.S. at 59.

In evaluating whether the privilege should yield, courts must balance the public interest in protecting the flow of information against a defendant's right to prepare an adequate defense. *Bazzano*, 712 F.2d at 839. The Government may have to disclose an informant's identity include when "(1) the [informant's] possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the

---

[5] Mr. Sacko seeks disclosure of the identities of both CS-1 and CS-2. Because the Government will call CS-2 at trial, and has therefore agreed to disclose her identity, the Motion is moot as to CS-2.

accused, in the transaction charged." *Jiles*, 658 F.2d at 198-99. On the other hand, "[m]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity." *Bazzano*, 712 F.2d at 839 (quotations omitted)).

"[T]he first step in determining whether the identity of an informant must be disclosed is to ascertain what need, if any, the defendant has alleged for disclosure." *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir. 1981). However, even when the information from a confidential informant may be significant for a defendant's defense, a court may deny a motion to compel when there is a threat of danger to the confidential informant. *See Jiles*, 658 F.2d at 199. "The second part of the '*Roviaro* test' requires a balancing of the [Defendant's] interest in disclosure against the Government's interest in maintaining the confidentiality of its informant." *Id.* at 198. "If the result of this balance is that disclosure of the informer's identity will be essential to a fair determination of a cause, the Government's privilege must give way." *Id.* The "burden is on the defendant to show the need for disclosure." *Id.* at 197.

The record in this case establishes that CS-1's role extended beyond identifying Mr. Sacko to law enforcement. As Agent Scanlan testified, CS-1 acted at agents' direction to facilitate contact between Mr. Sacko and CS-2. Mr. Sacko contacted CS-2 only after a coordinated effort that included multiple attempts by CS-1. Under these circumstances, CS-1 cannot be fairly characterized as a mere "tipster." Instead, she was an active

participant in the events that initiated the investigation and led directly to the charged conduct. As a result, CS-1's testimony is potentially highly relevant to the defense.

That relevance is particularly significant considering a possible entrapment defense. Entrapment turns on whether the government induced the defendant to commit the charged offenses and whether the defendant was predisposed to commit them. *See Sherman v. United States*, 356 U.S. 369, 376-378 (1958); *United States v. Russell*, 411 U.S. 423, 435-436 (1973). While the Government has introduced evidence of Mr. Sacko's subsequent conduct, the testimony at the hearing established that the initial contact between Mr. Sacko and CS-2 did not occur organically but resulted from a coordinated plan implemented through CS-1. Whether CS-1 encouraged, persuaded, or otherwise induced Mr. Sacko to engage in criminal activity, and the extent to which she did so at the direction of law enforcement, are factual issues central to that defense. Mr. Sacko is entitled to explore those issues in preparing its case.

That said, the Government has made a strong showing of particularized safety concerns. According to the Government, CS-1's significant other received a threatening letter from Mr. Sacko in prison. The person who received the letter destroyed it and did not intend to report it, but CS-1 reported it. However, according to the Government, CS-1's significant other confirmed to Agent Scanlan that he had received the threatening letter. The Government's representations, which at least at this stage I will credit, raise a specific, particularized risk in this case that disclosing CS-1's full identity to Mr. Sacko

could pose a threat to her or her significant other, above and beyond the ordinary risk to cooperating witnesses.

The threat that the Government has identified is not enough to deprive Mr. Sacko of the opportunity to develop his entrapment defense, but it is enough to warrant some limitation on Mr. Sacko's personal access to the information by restricting it only to his counsel. Federal Rule Of Criminal Procedure 16(d)(1) authorizes me, on a showing of good cause, to "deny, restrict, or defer discovery or inspection, or grant other relief." Per this rule, a "trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1986). "Although the rule does not attempt to indicate when a protective order should be entered, it is obvious that one would be appropriate where there is reason to believe that a witness would be subject to physical ... harm if his identity is revealed." Fed. R. Crim. P. 16 Advisory Comm. Notes (1974).

To determine good cause under Rule 16(d)(1), courts rely on the Third Circuit's test from *Pansy v. Borough of Stroudsburg*, 23 F.3d 835 (3d Cir. 1994). *See U.S. v. Luchko*, Case No. 06-cr-319, 2007 WL 1651139, at * 6 (E.D. Pa. June 6, 2007) (citing *United States v. Wecht*, 484 F.3d 194, 211 (3d Cir. 2007)). In *Pansy*, the Third Circuit mandated a balancing test to balance "the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled." *Pansy*, 23 F.3d at 787. To make that assessment, a court should consider the following non-exhaustive factors: (1) whether

disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for an improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public. *See id.* at 787-91. A court must balance good cause for a protective order with an accused's constitutional right to the effective assistance of counsel in criminal prosecutions. However, a protective order prohibiting defense counsel from sharing certain discovery with the defendant does not violate the defendant's Sixth Amendment rights. *See, e.g., United States v. Torres*, Case No. 20-cr-0418, 2020 WL 4500046, at * 4 (D.N.J. Aug. 5, 2020); *United States v. Moore*, Case No. 12-cr-02193, 2013 WL 3742414, at * 5 (E.D. Pa. July 17, 2013).

Mr. Sacko's lawyers need access to CS-1's full name and address so that they can contact her and investigate her interactions with law enforcement agents. However, Mr. Sacko does not appear to need her name or address. In fact, during the hearing, his counsel conceded that he does not need her address. And, based on the record before me, it appears that Mr. Sacko has never known CS-1's full name, only an alias or nickname. His entrapment defense is based on his communications with the person using that nickname, and he has access to the text messages that he has exchanged with her. Thus, restricting CS-1's name and address to counsel (and to any investigators or other third

parties working for counsel) does not appear to impact Mr. Sako's ability to participate in this defense or his counsel's ability to prepare his defense. These limits will balance the Government's concerns about witness safety with Mr. Sacko's right to mount a defense. Of course, if Mr. Sacko has a basis to argue that he needs CS-1's full identification, his counsel can always ask me to revisit the protective order that I will enter.

## III.    CONCLUSION

Law enforcement agents had probable cause to arrest Mr. Sacko, which means that I will not suppress the gun and cell phone they recovered in the search incident to that arrest. They also had several legal bases to search the car and recover his second cell phone. He then consented to the search of those phones, so I will not suppress the information from those phones. He also voluntarily waived his right to remain silent after receiving *Miranda* warnings, so I will not suppress his statements. The search warrant that Judge Sitarski issued was also valid, so I will not suppress the evidence from his house. Finally, I will order the Government to disclose CS-1's identity to Mr. Sacko's counsel, but I will restrict its dissemination to lawyers and those working for them. Mr. Sacko himself will not get that information. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

February 10, 2026